ATTORNEY FOR THE RESPONDENT
Pro se

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
Angie L. Ordway, Staff Attorney
Indianapolis, Indiana



In the

Indiana Supreme Court

No. 49S00-0910-DI-426

IN THE MATTER OF:

EVERETT E. POWELL, II,

*Respondent.*

Attorney Discipline Action
Hearing Officer Jose D. Salinas

**September 29, 2011**

**Per Curiam.**

We find that Respondent, Everett E. Powell, II, engaged in attorney misconduct by collecting a clearly unreasonable and exploitive fee from a vulnerable client in violation of Indiana Professional Conduct Rule 1.5(a). For this misconduct, we find that Respondent should be suspended from the practice of law in this state for at least 120 days without automatic reinstatement.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. Respondent's 2004 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. See IND. CONST. art. 7, § 4.

## Background

Prior to Respondent's representation of T.G., another attorney, Mark E. Ross ("Ross"), had represented T.G. in obtaining a settlement of a personal injury action. T.G. had a history of drug and alcohol abuse, and she was in an apparently abusive and controlling relationship with J.S., the father of her six children. In August 2004, Ross created, with T.G.'s consent, a "special needs trust" to hold $42,500 from the settlement to preserve T.G.'s eligibility for public assistance and to prevent rapid depletion by T.G. and those who may not be acting in her best interests, including J.S. Ross agreed to become the trustee because he was unable to find any other qualified individual or institution to serve.

T.G. soon began demanding access to the trust money, pressured, Ross believed, by J.S. and his mother. Ross sent a series of letters to T.G. reminding her of the purposes of the special needs trust, expressing willingness to surrender his position to a qualified successor trustee, saying that he was, in fact, very close to resigning as trustee (in which case, he told her a court would appoint a successor), and suggesting she contact some smaller banks to see if any would be willing to take over as trustee.

On October 27, 2004, T.G. (accompanied by J.S.) consulted Respondent about getting access to the funds in the trust. During this consultation, Respondent reviewed documents provided by T.G., which showed the amount of money placed in the trust and indicated Ross's willingness to step aside as trustee. Because T.G. did not have funds to pay a fee upfront, Respondent suggested that he could take the case on a contingent basis. On the same day, the parties entered into an agreement under which Respondent would "provide legal services concerning removal of Mark E. Ross as trustee of your Special Needs Trust" for a fee of "1/3 of whatever was in the trust." The agreement also stated:

➢ T.G. and her family have sought legal representation for some time and no attorney is willing to take on this case.

➢ T.G. had been given the option of paying for Respondent's services on an hourly basis.

➢ The agreement could result in a substantial fee for Respondent for little work.

2

➢ The parties agreed that the one-third fee was reasonable under the circumstances.

➢ J.S. attested to all the statements and signed as a witness.

The following day, October 28, 2004, Respondent faxed a letter to Ross telling him of T.G.'s dissatisfaction and asking him to dissolve the trust. Ross sent a return fax saying that he was glad T.G. had consulted an attorney and that he had offered to have the trust pay for one or two hours for legal work. Ross told Respondent of the reasons the trust was created and expressed concern that the assets would be quickly depleted if T.G. got unfettered access to them. On the same day, Respondent and Ross reached an agreement by phone that Respondent would take over as successor trustee.

Respondent prepared a short "Resignation and Replacement of Trustee" document, which T.G., Respondent, and Ross signed on October 29. Having became the successor trustee at this point, Respondent executed documents terminating the trust, in accordance with T.G.'s wishes. Ross gave Respondent the checkbook for the trust account, which was at Fifth Third Bank, along with a check for $3,917.40, written on Ross's attorney trust account, which Ross was holding for payment of outstanding medical bills.

Still on October 29, Respondent and T.G. went to the downtown branch of Fifth Third Bank and showed employees there the trust termination documents. They refused to allow Respondent to sign anything allowing T.G. to withdraw any money from the trust account. Respondent and T.G. then went to another branch of Fifth Third Bank. Without showing the employees there the trust termination documents, he executed a signature card for the trust account in his purported capacity as trustee. He deposited the $3,917.40 check into the trust account, although it was not part of the trust assets.

Later on October 29, Respondent prepared an accounting of funds to be distributed from the trust, showing $14,815.55 as his fee, $200 to be held for any tax and accounting fees, and $29,429.62 for T.G. The beginning balance was off by $500 and it included the $3,917.40 that

was intended for payment of outstanding medical bills.[1] Respondent and T.G. went to yet another branch of Fifth Third Bank that was open late. In his purported capacity as trustee, he also wrote a check to a different bank for $29,429.62 with the notation "Opening Account for [T.G.]." On October 30, 2004, he wrote a check on the trust account to his firm for $14,815.55.

After these two checks cleared, the balance of the trust account was $667.44. Respondent provided no tax and accounting services and did nothing to secure the funds remaining in the account, which were completely depleted by bank fees by September 2008.

The hearing officer rejected any justification for a one-third contingent fee Respondent collected for his services and calculated that a reasonable fee for Respondent's services was $3,000, based on 15 hours of work at $200 per hour.

## Discussion

Collection of an unreasonable fee. The Commission charged Respondent with violating Indiana Professional Conduct Rule 1.5(a), which prohibits making an agreement for, charging, or collecting an unreasonable fee.[2]

Even if a fee agreement is reasonable under the circumstances at the time entered into, subsequent developments may render collection of the fee unreasonable. In Matter of Gerard, 634 N.E.2d 51 (Ind. 1994), an elderly, hospitalized woman (Randolph) retained the respondent to prepare a will and help recover certificates of deposit she believed were lost or stolen. The fee agreement stated that the respondent was to receive "as a retainer an amount equal to one-third of all assets recovered." Id. at 52. He charged $250 for preparing a will, and during the following month, he located 23 certificates of deposit, all safely deposited under the client's name, with a value of over $450,000. He retained a fee of nearly $160,000. The respondent's actions were largely administrative and required no specific legal skill. He claimed he spent 160 hours in this effort. After the client died, her estate filed suit against him to recover the allegedly excessive

---

[1] It does not appear that these funds were ever applied to the medicals bills for which they were intended.

[2] Even if the evidence eventually adduced arguably may have supported charges that Respondent violated other Professional Conduct Rules, the only charge against Respondent is violation of Rule 1.5(a).

fee. The respondent then renegotiated his fee and retained just $28,000 for his services (for 160 hours at his customary rate of $175.00 per hour).

> [T]he Hearing Officer found no evidence Respondent knew collection of Randolph's assets would be a simple, uncontested matter until after Randolph signed the contingency fee agreement. However, a more important fact is that **Respondent did not renegotiate his fee after realizing his client's entitlement to the certificates was not seriously in doubt, but instead nonetheless accepted the inflated contingency fee**. . . .
>
> . . . Respondent's acts in securing the inflated fee represent greedy overreaching. His proper course of action would have been to renegotiate his fee after it became apparent that collection of Randolph's assets was a simple, uncontested matter. His failure to immediately do so indicates a conscious attempt to secure an excessive fee, which imparts added culpability to Respondent's acts.

Id. at 53-54 (emphasis added).

In the current case, Respondent may have reasonably believed at the outset that removing Ross as trustee would be contested (despite documentation indicating Ross was willing to step aside in favor of a qualified successor). He may have even reasonably questioned the amount of money in the trust upon which his fee would be calculated and collected (despite documentation that $42,500 had been deposited in it just a few months earlier). But within two or three days, Ross agreed to resign as trustee in favor of Respondent, and Respondent had assumed control over the trust, knew the balance in the trust account, had gained access to those funds, and had cut himself a check for his fee. At this point, he knew the case did not involve any complex issues, prolonged time commitment, risk of no recovery, or even any opposition.

Respondent argues that his fee can be justified by the "red flags" raised by a client who was complaining about her former attorney, because such a client might turn around and give him the same treatment. Also, Ross had warned Respondent that if he dissolved the trust and the assets were quickly dissipated, T.G. would likely have a legal action against him for breach of trust. Even if "red flags" that a client may be difficult to deal with could justify a higher fee than would be reasonable otherwise, we reject any suggestion that an attorney's concern that he may be committing legal malpractice in representing a client justifies charging the client a higher fee.

5

We do not suggest that a contingent fee must be reduced every time a case turns out to be easier or more lucrative than contemplated by the parties at the outset. But collection of a fee under the original agreement is unreasonable when it gives the attorney an unconscionable windfall under the totality of the circumstances. On the evidence before us in this case, we conclude that Respondent violated the Indiana Professional Conduct Rule 1.5(a) by collecting an fee that was clearly excessive and unreasonable under the totality of the circumstances.

Discipline. "Our analysis of proper sanction entails consideration of the nature of the misconduct, the duty violated by the respondent, any resulting or potential harm, the respondent's state of mind, our duty to preserve the integrity of the profession, the risk to the public should we allow the respondent to continue in law practice, and matters in extenuation, mitigation, and aggravation." Matter of McCarthy, 668 N.E.2d 256, 258 (Ind. 1996).

We agree with the hearing officer's finding of the following facts in aggravation: (1) Respondent is not remorseful; (2) he lacks insight into his misconduct; (3) he made disingenuous, contradictory, unsupported, and evasive assertions during the proceedings; (4) he did not cooperate fully with the Commission's investigation; (5) he was on notice that his client was vulnerable and took an indifferent attitude; (6) he made misrepresentations to Ross (that he intended to act as trustee when he intended to terminate the trust) and to Fifth Third Bank (that he was acting as trustee when he had already terminated the trust); and (7) he has not made restitution. We find the following facts in mitigation: (1) Respondent has no disciplinary history; and (2) at the time of the misconduct, he was newly admitted to the bar.

Disciplinary cases involving fee violations may result in a sanction no more severe than a public reprimand, even when the respondent vigorously denies wrongdoing. *See, e..g.,* Matter of O'Farrell, 942 N.E.2d 799 (Ind. 2011); Matter of Lauter, 933 N.E.2d 1258 (Ind. 2010). Suspension, however, is warranted when the misconduct involves clearly exploitive overreaching. In Matter of Hefron, 771 N.E.2d 1157 (Ind. 2002), the respondent was retained by a client to recover assets belonging to a probate estate for an hourly fee. The respondent did little on the case, but after the client worked extensively to find assets that were easily recoverable, he insisted that the client agree to a contingent fee. He obtained court approval of

6

over $76,000 in fees and sought additional fees of over $25,000. The probate court eventually reduced his fee to $40,000. The Court imposed a six-month suspension with automatic reinstatement. In Matter of Thayer, 745 N.E.2d 207 (Ind. 2001), the respondent agreed to prosecute a claim for a contingent fee of 40 percent. On the day of settlement, the respondent presented new fee agreement to the client providing that he would receive 50 percent of settlement. The client felt she had no choice and signed the new agreement to obtain her portion of the settlement proceeds. For this and other misconduct, the Court imposed a 30-day suspension without automatic reinstatement.

Exploitive overreaching in misconduct involving fees is even more culpable when the client is particularly vulnerable. In Matter of Gerard, discussed above, the Court imposed a suspension of one year without automatic reinstatement for collecting an unreasonable fee from an elderly, hospitalized woman. In the current case, Respondent was on notice from the outset of the circumstances that prompted T.G. herself to agree a special needs trust just two months earlier—her history of drug and alcohol abuse, her apparently abusive and controlling relationship with J.S., the need to preserve her eligibility for public assistance, and the danger of rapid depletion if she had unfettered access to the funds. Respondent not only dissolved the special needs trust that was meant to protect her assets from dissipation, but he actually began the dissipation by retaining an unreasonable fee from those assets.

In light of Respondent's collection of an unreasonable fee from a vulnerable client, his lack of insight into his misconduct, and the other aggravating circumstances described above, we conclude that Respondent should be suspended for 120 days without automatic reinstatement.

## Conclusion

The Court concludes that Respondent violated the Indiana Professional Conduct Rule 1.5(a) by collecting a clearly unreasonable and exploitive fee from a vulnerable client.

For Respondent's professional misconduct, the Court suspends Respondent from the practice of law in this state for a period of not less than 120 days, without automatic reinstatement, beginning November 11, 2011. Respondent shall not undertake any new legal

7

matters between service of this order and the effective date of the suspension, and Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of the minimum period of suspension, Respondent may petition this Court for reinstatement to the practice of law in this state, provided Respondent pays the costs of this proceeding, fulfills the duties of a suspended attorney, and satisfies the requirements for reinstatement of Admission and Discipline Rule 23(4). Reinstatement is discretionary and requires clear and convincing evidence of the attorney's remorse, rehabilitation, and fitness to practice law. See Admis. Disc. R. 23(4)(b).

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d). The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

All Justices concur.